JoNes, Chief Judge,
delivered the opinion of the court:
This is a suit by an officer in the United States Naval Reserve who became 60 years of age on July 2, 1949. He seeks retired pay under the Act of June 29, 1948, 62 Stat. 1081.
Plaintiff was mustered into the Naval Militia of the State of Maine on April 4, 1906, and served continuously until June 7, 1915. He was discharged therefrom to accept a commission as ensign. He served in that capacity and as lieutenant, junior grade, from June 8, 1915, until April 5, 1917, at which time his organization was called into the Federal Service. Plaintiff thereafter saw periods of service with the United States Navy and Naval Reserve Force until July 1,1982, when he was transferred, upon his own request, to the Honorary Retired List in the rank of lieutenant without pay or allowances.
Title III of the Act of June 29, 1948, 62 Stat. 1087, as amended, provides for a system of retirement with pay *699 for members and former members of the National Guard and other reserve components of the armed forces. The statute provides that subject to certain conditions any person who upon attaining the age of 60 years and who has completed an aggregate of 20 or more years of satisfactory Federal Service in the organizations named in the act should upon application be granted retired pay. The act included under conditions named not only federally recognized service in the National Guard, but also the Naval Militia subject to compliance with certain standards described by the Secretary of the Navy. The Secretary of the Navy was authorized by the act to prescribe such rules, regulations, and procedures as he might deem necessary to effectuate the provisions of Title III.
The plaintiff was denied retirement on the premise that neither his service in a Naval Militia prior to February 16, 1914, nor his service while on the United States Naval Ee-serve Honorary Eetired List from July 1, 1932, to June 30, 1949, could be credited as Federal Service within the meaning of the 1948 act. Accordingly, plaintiff was advised by the Chief of Naval Personnel that excluding these two periods he had only a total creditable service of 18 years and 24 days, and that he did not have 20 years of satisfactory Federal Service in components of the armed services.
In seeking retired pay, the present suit was filed on the ground that these two periods of service which had been rejected should be allowed and that plaintiff is entitled to retired pay.
After the filing of this suit, the Comptroller General ruled on January 11, 1954, that under the terms of the 1948 act, supra, service on the Honorary Eetired List of the Naval or Marine Corps Eeserve, being service as a member of a reserve component, should be deemed a period of satisfactory Federal Service as provided in the act.
This ruling disposes of the major issues involved in this case. It is practically admitted that plaintiff is entitled to recover retired pay on the basis of his satisfactory service rendered after the passage of the Act of February 16,1914, 38 Stat. 283.
*700 Plaintiff, however, contends that his service prior to the 1914 act, and especially that period of service between April 4,1906, and May 27,1908, should be counted.
Plaintiff claims credit for this service on the basis of what is known as the Dick Act, approved January 21, 1903, 32 Stat. 775. Pie cites this court’s opinions in Price v. United States, Waterbury v. United States, and Presson v. United States, reported in volume 121 Ct. Cl. at pages 664, 687, and 695, respectively.
In those cases this court held that the National Guard was federally recognized by the terms of the Dick Act for any period of service subsequent to January 21, 1903. The plaintiff asserts that if he is entitled to credit for all or any portion of his service between April 4, 1906, and February 16, 1914, he would be entitled to a greater retirement pay on the basis of longevity of service.
It is very clear that plaintiff is not entitled to recover for the period of service between May 27, 1908, and February 16,1914, on account of the provision in the 1908 amendment to the Dick Act, 35 Stat. 399, which in reenacting the major provisions of the Dick Act, included this provision:
That the provisions of this Act and of section sixteen hundred and sixty-one, Revised Statutes, as amended, shall apply only to the militia organized as a land force.
On the basis of this amendment the service could not be counted between the date of its adoption in 1908 and February 1914, when the Naval Militia was specifically included subject to the conditions named in the 1914 act. This later act sets out fully the provisions for the operations of the Naval Militia and fully recognizes it as an organization. At that time, 1914, or soon thereafter, the Navy Department set up a comprehensive and detailed program for the Naval Militia.
Plaintiff asserts, however, that the very enactment of this amendment in 1908 by implication shows that it was the intention of the Dick Act to include the Naval Militia prior to the adoption of the amendment in the 1908 act.
The defendant asserts that this was merely a clarifying provision and that all of the terms of the 1903 act show that it was meant to apply only to the land forces.
*701 It seems to us that the Dick Act manifestly applied only to the land forces in the form it was enacted in 1903. It makes no mention whatever of the Naval Militia. It provides that the organization, armament and discipline of the organized militia in the several states “shall be the same as that which is now or may hereafter be prescribed for the Regular and Volunteer Armies of the United States.” It refers to the pay provided by law for the Regular Army. It stipulates that the Secretary of the Army may issue to the militia such arms and equipment “as are required for the Army of the United States.”
We have secured a report of the Senate Committee on Military Affairs in connection with the enactment of S. 4316, dated May 8, 1908. This report discusses the new law and certain amendments to the original Dick Act, but makes no reference whatever to the amendment which plaintiff seeks to invoke. The entire report is based on the land forces militia. It includes a letter from the Acting Secretary of War and also a statement by the Assistant Secretary of War. No reference is made anywhere in the report except in connection with the land forces. The report includes a statement to the effect that National Guardsmen are on the same plane as Regular Army if war occurs; that in the event of war they become a part of the United States Army; that the volunteers should be officers of the United States Army and the National Guard who may be found qualified. It states that the forces of the National Guard, after taking their education and their drill work which they get in their State armories, will go to their State camps for one year; that the Army will give them as many officers as may be needed to assist them in instruction and advice and especially to endeavor to provide a small body of regular well trained troops as a sort of exhibit or example. When the entire bill and report are considered together, it becomes manifest that it was intended that the original Dick Act should apply only to the land forces prior to the 1914 act after which there is no doubt the Naval Militia was included.
Both parties are agreed that the plaintiff is entitled to count the service indicated and is therefore entitled to re *702 tired pay because of his 20 years of satisfactory service after the 1914 act.
Plaintiff is entitled to retired pay under the act of 1948 and in fact has been so credited and paid. (See plaintiff’s motion for reargument filed December 3, 1959.) Therefore, that question is now moot, and since he is not entitled to credit for his pre-1914 service in the Naval Militia of Maine, his petition will be dismissed.
It is so ordered.
LittletoN, Judge {Bet.); Laeamoee, Judge; Madden, Judge, and Whitaker, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, Maynard L. Fickett, was born in the town of Millbridge, in the County of Washington and State of Maine, on July 2, 1889.
2. Plaintiff was mustered into the service in the Naval Militia, State of Maine,[1] on the fourth day of April 1906, as a seaman, for a period of three (3) years, and he served continuously therein until the seventh day of June 1915, at which time he was honorably discharged therefrom to accept a commission as ensign.
3. He served continuously as an ensign and lieutenant (jg.) from the eighth day of June 1915 until the fifth of April 1917, at which time his organization was called into the Federal Service.
4. He served continuously as an ensign and lieutenant (jg.) on active duty with the United States Navy from April 6, 1917, to July 18, 1919, at which time he was placed on inactive duty.
5. Plaintiff transferred to class 2, U. S. Naval Deserve Force on July 1, 1918, and was honorably discharged on July 17, 1920, because of expiration of enrollment; he re-enrolled in the U. S. Naval Deserve Force on September 25, *703 1920, and was discharged on September 24, 1924; he again re-enrolled on November 3,1924, in the U. S. Naval Keserve Force and served until July 1, 1932, when he transferred, upon his own request, to the Honorary Betired List in the rank of lieutenant without pay or allowances.
6. During the period April 4, 1908, to February 15, 1914, the plaintiff, as a member of the Maine Naval Militia, attended drills on a regular weekly schedule. The training which he received at such drills included seamanship, infantry drills, battalion drills with one-pounders, instructions in ordnance and gunnery, boat training with a cutter loaned by the Navy Department and, beginning about 1913, in navigation. Navy manuals were employed as guides and Navy equipment loaned to the Maine Naval Militia was used. In addition to attending such scheduled weekly drills, the plaintiff, as a member of the Maine Naval Militia, participated during this period in exercises of the Naval Militia of the United States on United States Naval vessels under the supervision of the Navy Department as follows:
I Sep 1906-8 Sep 1906 inch, U. S. S. Columbia.
20 Aug 1907-28 Aug 1907 inch, U. S. S. Prairie.
7 Aug 1908-16 Aug 1908 inch, U. S. S. Yankee.
25 Jul 1909-1 Aug 1909 inch, U. S. S. New Hampshire.
22 Jul 1910-31 Jul 1910 inch, U. S. S. Vermont.
15 Jul 1911-21 Jul 1911 inch, U. S. S. Nebraska.
6 Jul 1912-14 Jul 1912 inch, U. S. S. Chester.
II Aug 1913-18 Aug 1913 inch, U. S. S. Alabama.
During such annual exercises, the officers and men of the Maine Naval Militia, among other things, engaged in target practice, loading drills, signaling, fire drills, routine ships drills, and performed watch and division duties.
7. Congress enacted the Dick Act on January 21, 1903 (32 Stat. 775). An amendment to this Act was passed by the Congress May 27,1908, whereby it was provided in pertinent substance that the provisions of Section 1 of the Dick Act “shall apply only to the Militia organized as a land force.”
8. The laws of the State of Maine, with respect to service in the Naval Militia, have been in full force and effect from April 4,1906, to the present time.
Section 4, Article YII, Military Law; Constitution of the State of Maine, is as follows:
*704 Amended by XL.
SectioN 4. Tbe organization, armament and discipline of the Militia and of the military units thereof shall be the same as that which is now or may hereafter be prescribed by the laws and regulations of the United States; and it shall be duty of the Governor to issue from time to time such orders and regulations and to adopt such other means of administration as shall maintain the prescribed standard of organization, armament and discipline, and such orders, regulations and means adopted shall have the full force and effect of the law.
Section 6 of an act to amend Chapter 46 P. L. of 1899, establishing a Naval Reserve as part of the N. G. of the State of Maine, reads as follows:
Sec. 6. The system of administration and instruction of the Naval Reserve shall conform as nearly as possible to that of the Navy of the United States.
Duty shall be performed afloat when possible.
The following excerpts, concerning tours of duty by the Naval Reserve of the State of Maine for pertinent periods of this claim, have been certified under the State Seal as being true copies of records now in existence in the Office of the Adjutant General, State of Maine:

190b.

Annual tour of duty of the Naval Reserve, July 9 to July 17, 1904.
Report of Lt. H. M. Bigelow, Com’d’g.
Gen. Order No. 1 A. G. O. N. G. S. M.
Ships Company Naval Reserve, will perform their annual tour of duty both afloat and ashore, going into camp at High Head, Harpswell, Maine, at noon July 9, 1904, break camp July 17,1904.
It being the idea of the Navy Department to have this command familiarize themselves as far as possible with the coast contiguous to Portland Harbor, and in succeeding years to extend the scope of this work along the entire coast until Officers and men have a fair idea of the strategical points from Eastport to Boon Island. To assist, the Navy Department sent the U. S. S. Sioux, in charge of Gunner Whitehead, U. S. N., with a coast pilot attached to the Naval service.
The Secretary of the Navy was requested to detail a regular Naval Officer to inspect the Naval Militia.

*705
1905

Annual cruise of the Ships Company Naval Reserve, N. G. S.M.
Report of Lt. H. M. Bigelow, Com’d’g.
In accordance with special order No. 54 A. G. O. dated _ July 27, 1905.
_ Ships Company N. R. reported on board U. S. S.
Chattanooga, Com’d’r Alex Sharp, Captain, at noon Aug. 9, 1905. Disembarked Aug. 16, 1905.
Under the provisions of the “Dick Bill,” the N. G. S. M. is constantly approaching the regular service in general efficiency and methods of drill, clothing, equipment, target practice, etc., and all orders and blanks, in so far as practicable, are based upon the United States forms.
GENERAL ORDER NO. 7
Act of Legislature to amend P. L. 1893, Chapter 266, and other amendments, authorizing the President, in event of invasion or rebellion etc., for a period of nine months, in any part of the United States, to call out such number of the enrolled militia or such portion of the N. G., as he may deem necessary.
Page 241, Sec. 26. The active Militia shall be known and designated as the National Guard of the State of Maine, and on peace footing shall consist of not more than 24 companies of infantry, one battery of light artillery, two troops of cavalry and a Naval Reserve.
Sec. 121. System of discipline and exercises of the N. G. shall conform generally to that of the army of the U. S. as now or may hereafter be prescribed by Congress.

1906

Annual Cruise, Ships Company N. R. Sept. 1 to Sept. 8 inc.
Sept. 1 reported on board U. S. S. Colmmbia.
Sept. 4 transferred to the U. S. S. Tacoma.
Sept. 8 reported to home station.
Report of Com’d’r James T. Smith, U. S. N., Commanding.
In obedience to Departments telegraphic orders of Sept. 4, 1906, the Maine Naval Militia, consisting of 4 Officers and 53 men, were received on board from the CoVambia, at 2: 30 P. M. Sept. 4, 1906.
_ Officers and men were watched, quartered and stationed according to their ranks and ratings with ships division officers and men.
*706 The exercises during this cruise consisted of great gun drills, morris tube practice, loading machine drill, sub-calibre practice, signaling, and also the regular routine drills.
Officers and men showed zeal and aptitude for the service and the conduct of the men while on board was excellent.

1907

Annual cruise of the Naval Militia Aug. 20, to Aug. 28, 1907 on board the U. 8. S. Prairie.
Officers and men participated in target practice, loading drills, signaling and stood regular watches with ships crew.
The Battalion was divided into two forward deck divisions, each in charge of one of their own line officers, and took care of that part of the ship except for anchoring and getting underway.
Discipline of the men was excellent.
So reported by F. L. Chadwick, Lt. U. S. Navy, Executive Officer.

1908

Annual cruise of Naval Militia on U. S. S. Yankee, Com’d’r C. C. Marsh, Commanding, Aug. 7-Aug. 16, inc.
Commander Marsh issued instructions for the cruise. Officers and men assigned to watch and division duties. Target practice and routine ship drills were carried out. Special Orders Nos. 12, 16, 92, relating to board on revision of Military Laws of the State.
Gen. Order No. 7.
Acting Sec. of War authorized the detail of Capt. Samuel T. Ansel, 8th TJ. S. Infantry to relieve Capt. Joseph Wheeler, Jr., C. A. C., U. S. A. as inspecting officer of the N. G. S. M. in accordance with an act of Congress entitled: An Act to promote the efficiency of the Militia and other purposes approved Jan. 21, 1903. Gen. Order No. 28.
Dated Sept. 15, 1908.
Directed by the Asst. Sec. of War to call attention to lack of instruction of many men previous to annual tour of duty. Considered by our department to be profitless and an unnecessary expense.
Paragraph 185, Regulations of the War Department Governing the organized Militia, amended; authorizes payment to any portion of the organized militia when on encampment, maneuvers, and field instruction of any part of the regular army, after being mustered by an *707 officer of the regular army, may be paid at any time after such, muster for the period from the date of leaving the home rendezvous to the date of return thereof, as determined in advance, both dates inclusive.

1909

Annual cruise of the Naval Eeserve, July 24, 1909 to Aug. 2, 1909.
On board U. S. S. New Hampshire, Capt. C. McE. Wins-low U. S. N. Commanding, Southern Drill Grounds.
Target practice and Ship Drills were carried out Capt. Winslow reported to the Commander-in-Chief, U. S. Atlantic Fleet. U. S. S. Connecticut, Flagship, in regard to this cruise of the Maine Naval Militia.

1910

Annual cruise of the Naval Eeserve July 22 to July 31, 1910, on board U. S. S. Vermont.
Lt. Com. Guy L. Weymouth, Commanding the N. E. Gen. Order No. 148 dated, Augusta, July 19, 1910.
War Dept. Gen. order No. 247 dated Washington, Dec. 20, 1909. Authorized enlisted men of the organized militia of suitable qualifications, may attend and pursue regular courses of instruction, when facilities are available, at the service schools for enlisted men announced by the War Dept, as being comprised in the military system of United States.
Target practice and ships drills were carried out.

1911

Annual cruise of the Ships Company N. E. N. G. S. N. July 15 to July 21 inc. on board U. S. S. Nebraska joining the North Atlantic fleet for maneuvers.
Lt. Com. E. K. Dyer, Commanding the N. E.
Com. G. L. Weymouth Eesigned.
Officers and men assigned watch and division duties pairing up with regular ships crew.
Fleet tactical maneuvers, gun drills and the routine ship drills comprised the training for all of this cruise. Pay for attendance at drills was instituted this year.

1912

Annual cruise of the Naval Eeserve, July 6 to July 14. Spec, order No. 85 A. G. S. office dated June 22, 1912. Eeported on board U. S. S. Chester Sat. July 6.
Gun drills, anchor drills, lifeboat drill, target practice and fire drills were carried out.
*708 Naval reserves included in compensation for armory drills.
Money paid to company treasurer, bonded. _
_ Naval reserve took part in state rifle competitions.
One man made the state team at Wakefield.
No unit could be a prize winner which has not shot the minimum number of men allowed to the unit by the div. of N. M. affairs of the War Dept, or the Secretary of the Navy, in competing for the National Defense Trophy presented by the E. I. DuPont de Nemours Powder Co.
Organizations of the N. E. will render honors prescribed by the regulations for the government of the Navy of the United States.
Methods of writing letters and endorsements prescribed herein will be used in all official correspondence in the military service of the State of Maine, in order to conform to the requirements of the Begular Service under the provisions of G. O. No. 22 War Dept. Wash, dated Aug. 5,1912.

1913

Annual cruise of the Ships Company Naval Eeserve Aug. 11, to Aug. 17, on board the U. S. S. Alabama, Lt. Com. E. K. Dyer, Commanding N. E. Becom-mended that the plan of organization, routine and orders compiled and arranged by Lt. (J. G.) C. C. Gill U. S. N. and approved by Commander C. F. Preston, Commanding the Alabama, be followed each year, with such modifications as may be deemed better by actual practice. Lt. Com. E. K. Dyer, on orders from the Navy Department reported on board the U. S. S. 'Wyoming, Oct. 23, 1913, and was assigned to duty on the U. S. S. Ohio, as assistant to executive officer and also assistant to the Navigator. Nov. 23, he was transferred to the U. S. S. Vermont and assigned duty with the ordnance officer.
9. The summer tours of training duty in which plaintiff engaged prior to 19M and which tours are noted in finding 6 hereof, were performed while he was a member of the State of Maine Naval Militia and at which time he was under orders from that authority. In accordance with the custom and practice of the Navy at that time, the commanders of the above-named vessels were ordered to take aboard members of the State Naval Militia and to accommodate them for the periods of the summer cruises. However, the Naval Militia *709 personnel have not been shown to have been under any specific individual orders from the United States Navy during these training cruises.
10. Article 2 (2), Eegulations for the Government of the Navy of the United States, 1905, provides that “The Assistant Secretary of the Navy has had assigned to him by the Secretary cognizance and general supervision of all matters pertaining to the following: * * * the Naval Militia; * *
United States Navy Eegulations and Naval Instructions, 1913, provide in pertinent substance as follows:
Art. 106. The division of Personnel shall include the Bureau of Navigation, * * * and shall have cognizance of matters affecting the Naval Militia.
Art. 132. (1) The duties of the Bureau of Navigation shall comprise * * * the operation of the * * * Naval Militia * * *.
(11) It shall be charged with all matters pertaining to the Naval Militia * * *
Art. 244. The supervisor of a naval district shall be responsible for
# $
(c) The instruction of Naval Militia officers in the organization and plans of their respective districts.
11. The Annual Eeport of the Operations of the Naval Militia for the year 1908 and 1909 (printed by the Government Printing Office, Washington, D. C., 1910, under the seal of the Navy Department), indicates that as of September 18,1909, the date of the report, the Naval Militia remained under the supervision of the Assistant Secretary of the Navy where it had been placed by order of the Secretary of the Navy dated October 21,1905 (House Eeport No. 1231, Committee on Naval Affairs, 60th Congress, 1st Session). By February 3, 1911, the Naval Militia was apparently under the supervision of the Office of the Aid for Personnel and by December 28, 1911, there had been established in the Navy Department Division of Personnel, an Office of Naval Militia.
12. As early as September 1905, the Navy Department had begun issuing general and special orders to the various Naval Militia organizations, including specifically that of the State of Maine. Commencing January 17,1910, the Navy Depart *710 ment, in furtherance of its policy “to make both organization and training of the Naval Militia accord as far as possible with that of the Navy”, issued circular letters, during the period January 17,1910, to June 30,1911, to all Naval Militia organizations, including that of the State of Maine. These Naval Militia circular letters dealt, among other things, with the constitution of personnel of the Naval Militia, summer exercises, issuance of books, studies in navigation preparatory to summer cruising, classification of Navy stores and material and instructions concerning the preparation of requisitions and reports of boards of survey, books of instructions for line officers, directing the keeping of data regarding professional work during.the summer, target practice, program for summer exercises, summer exercises, and instructions concerning Naval Militia target practice.
13. The Navy Department also published and issued to each Naval Militia organization a number of publications, including the following:
Naval Militia Publication No. 1, Instructions for Gun Crews;
Naval Militia Publication No. 2, How to Stand Watch;
Naval Militia Publication No. 3, Method of Conducting Target Practice;
Naval Militia Publication No. 4, Tactical Signal Book for Use by the Naval Militia;
Naval Militia Publication No. 5, Uniform Peculations;
Naval Militia Publication No. 6, Naval Militia Distinguishing Flag and Pennant; and
Naval Militia Publication No. 7, Naval Militia Accounting Instructions with Special Eeference to Ships, Equipments and Stores.
According to Naval Militia Publication No. 5, promulgated July 1, 1910, by the Secretary of the Navy, the uniform therein “prescribed for the Naval Militia designates the wearer as a member of a coordinate branch of the Navy of the United States and further indicates his state organization.”
14. The Eegister of the Commissioned and Warrant Officers of the Naval Militia of the United States, published January 1,1910 (printed by the Government Printing Office, Washington, D. C., 1910, under the seal of the Navy Department) , referred to as “the first of its kind along these lines” *711 but, according to tbe Navy Department’s plan, to be published annually thereafter, recorded the “Strength of the Organized and Uniformed Naval Militia of the United States” in pertinent part as follows:

Commissioned Warrant Petty

officers officers officers Men Total

*****
Maine _ 3 _ 16 60 69
*****
15. For each of the years 1906 to 1914, Congress, in the respective annual Naval Service Appropriation Acts, appropriated moneys for “Arming and Equipping Naval Militia,” as set forth below:

Year Amount Stats, at Large

1905_$60,000 33 Stat. 1092, 1095
1906 _ 60, 000 34 Stat. 553, 558
1907 _ 60, 000 34 Stat. 1176, 1181
1908 _ 100, 000 35 Stat. 127, 133
1909 _ 100,000 35 Stat. 753, 760
1910_ 125, 000 36 Stat. 605, 612
1911_ 125,.000 36 Stat. 1265, 1272
1912_ 125,000 37 Stat. 328, 336
1913_ 125, 000 37 Stat. 891, 896
Each of the Naval Service Appropriation Acts cited above provided that the expenditure of the said appropriations should be “under such regulations as the Secretary of the Navy may prescribe * * The allotment to the state organizations of the funds appropriated annually by Congress was directed by the Secretary of the Navy and was proportional to the number of enlisted men.[2] In order that an organization of the Naval Militia might participate in the annual appropriations, expended for or disbursed among the organizations at the rate of about $10 per man, it was stated that the Secretary of the Navy “requires certain regulations to be enforced regarding the care of the equipment loaned to such organizations and in matters of the general efficiency of the personnel.” [3] As stated in a memorandum dated April 22, 1913, from Franklin D. Eoosevelt, then Assistant Secre- *712 tarj of the Navy, to the Bureau of Medicine and Surgery, the annual appropriation “is apportioned among the several States, Territories, and the District of Columbia, under certain regulations prescribed by this Department and each naval militia organization is restricted to its quota in the matter of expenditures for the supplies above referred to.”
16. The regulations which the Secretary of the Navy required to be enforced during the period of 1906 to 1914, in order to establish eligibility for participation in the annual Federal appropriation for “Arming and Equipping Naval Militia,” are not in evidence. The record establishes, however, that the Naval Militia of the State of Maine participated in such annual Federal appropriations during the years 1905, 1906,1909,1910,1912 and 1913.
The record does not show whether the State of Maine shared in these appropriations for the years 1907, 1908 and 1911.
17. On February 16, 1914, “An Act to promote the efficiency of the Naval Militia, and for other purposes,” was enacted into law (38 Stat. 283). Thereafter, pursuant to the authority vested in him by that Act, the Secretary of the Navy issued general orders prescribing standards for the composition, administration and operation of the Naval Militia in accordance with the provisions of the Act. A witness for the defendant testified that the first published order setting forth qualifications for personnel of the Naval Militia was issued July 26,1914.
18. The evidence establishes (1) that both general and special orders relating to the Naval Militia were issued by the Navy Department at least as early as September 25,1905, and (2) during the period 1906 to 1914, the Secretary of the Navy prescribed regulations regarding the care of equipment loaned to the Naval Militia organizations and with respect to the general efficiency of the personnel of such organizations and (3) that from and after January 17,1910, the Secretary of the Navy issued circular letters for the purpose of “advising the Naval Militia on subjects of policy, summer exercises, methods of drill, etc.” A Naval Militia Organization had to comply with the standards prescribed by the Secretary of the Navy for the Naval Militia during the period 1906 to *713 1914 in order to share in the annual Federal appropriations “For Arming and Equipping Naval Militia.” General Order No. 153 July 10, 1915 (Qualifications Required of Naval Militia Personnel) contained the first comprehensive set of rules or standards for Personnel of the Naval Militia.
19. The 1908-1909 Annual Report on the Naval Militia (Plaintiff’s Exhibit 17), at page 22, discusses “Recommendations as To Legislation” in part as follows:
There is imperative necessity for action by Congress.
The one great need is that a law of Congress should make of the intelligent, zealous, patriotic body now known as the Naval Militia, an organized national guard, similar in its relations to the National Government to that now occupied by their brothers in the Land Militia.
A review of the results accomplished by the War Department in one year with the Land Militia, since the passage of the bill known generally as the Dick Bill, forces the conclusion that no greater benefit could be conferred on the navy, the Naval Militia, and the country, than by adopting the main features of the Dick Bill to the Naval Militia.
And such report, at page 25, concludes with reference to the lack of examination of officer candidates:
_ This situation can be so easily improved, and by the simple process of establishing in the Navy Department a set of examinations for the different grades and offering the naval militia officers, or any others, the opportunity to present themselves for examination. The officer having passed the examination will then be duly recorded in the department as qualified in that grade and to be mustered into the service in time of war with that rank.
20. The Secretary of the Navy’s report for the fiscal year 1916 makes the following reference to the Naval Militia:
11. RECOGNITION OF NAVAL MILITIA OFFICERS, WHO ARE FULLY QUALIFIED UNDER NAVY DEPARTMENT GENERAL ORDER 153
A list of Naval Militia officers who have fully qualified to date, professionally, in accordance with General Order No. 153, has been published in the Navy and Marine Corps List and Directory for the month of March, 1916, and this list will appear subsequently in this monthly publication, and also in the Annual Navy and Marine Corps Register.
*714 12.CAUSES OF FAILURE OF NAVAL MILITIA TO INCREASE IN NUMBERS
The department realizes that vessels are necessary for training the Naval Militia and that it is essential that vessels be loaned to Naval Militia organizations and vessels will be loaned when possible.
The department also realizes that the Naval Militia is now passing through a period of reorganization, due to the effect of the adoption of the standards set by the Navy Department in accordance with the provisions of the Naval Militia act. It is hoped that when Naval Militia organizations have reorganized that a material increase in the strength and efficiency of the Naval Militia will result.
# $ $ * *
13.RETURN OF PERSONNEL
New forms for reports of personnel, which will enable divisions to report the number of enlisted men qualified by examinations of their own officers in accordance with General Order No. 153, will be issued by this division.
The methods of examining enlisted men is left to each State, with the suggestion that as far as possible General Order 163 [sic] of the Navy Department be followed as a guide.
14.CERTIFICATE OF QUALIFICATION
“Certificates of qualification” are now being prepared for issue to the Naval Militia officers who are fully qualified professionally in accordance with General Order 153, but these certificates will not be issued to the Naval Militia officers of any State that has not adopted the provisions of General Orders 153 and 150.
21. The Report of the Secretary of the Navy for the fiscal year 1918 comments as follows:
VALUE OF THE NAVAL RESERVE
The experience of 18 months in the world’s greatest war, where naval supremacy depended upon fit navy personnel, has demonstrated the fact that at the beginning of the war the Navy personnel was so organized that it could expand to meet war conditions. This was due to the many wise laws that have been enacted in the past few years and the well-laid plans carried out quickly and without friction. At the time I undertook the duties of Secretary off the Navy there were in the Navy some-
*715 tiling less than 48,000 men. Some men of vision felt the need of providing a reserve for emergencies, but practically no provision had been made for a trained reserve from which, in time of war, men could be drawn to fill any shortage of the Eegulars. It was apparent that steps should be taken to overcome this serious situation, and under the statesmanlike leadership of Capt. Victor Blue (then Chief of the Bureau of Navigation), who had vision and practical judgment, legislation was drafted which was wisely utilized during the war to meet naval needs.
THE NAVAL MILITIA LAW
At that time (1913) the only organization that made any pretense of training men for the Navy was the Naval Militia, and that was under State control, with practically no Federal supervision. As the militia seemed to offer the only means of producing a trained reserve, steps were at once taken to put it on a sound basis, and in the act of Congress approved February 16, 1914, a real Naval Militia under Federal control was created, provision being made for its organization and training m peace, as well as its utilization in war.
As with all organized militia, the Naval Militia, even with the law of 1914, could not, under the Constitution, be called into service as such except for limited duties, such as to repel invasion. It could not be used outside the territorial limits of the United States. It is evident that, with such restrictions, militia could hardly meet the requirements of the Navy in a foreign war, and to overcome this difficulty the “National Naval Volunteers” were created in the act approved August 29,1916.
22. All periods of service by the plaintiff, as hereinbefore set forth, were approved and allowed in computing the amount of plaintiff’s longevity pay when on active duty with the United States Navy.
23. The plaintiff, who became sixty (60) years of age on July 2,1949, has been denied retirement benefits under Title III of the Act of June 29, 1948, as amended (Public Law 810 — 80th Congress), on the premise that neither his service in the Naval Militia, prior to February 16, 1914, nor his inactive service while on the U. S. Naval Eeserve Honorary Eetired List from July 1, 1932,' to June 30, 1949, may be credited as Federal Service within the meaning of section 306 of the Act of June 29, 1948. The Chief of Naval Personnel *716 advised the plaintiff that, excluding his Naval Militia and Honorary Retired List service, he had a total creditable service of only 18 years, 24 days, that he did not have 20 years of “satisfactory Federal service” in components of the armed services and that he was therefore ineligible for such retirement benefits by reason of insufficient service. He was given credit, in the computation of such creditable service, for his years of service in the Maine Naval Militia subsequent to February 15,1914.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

 The official designation at the time was Ships Company, Naval Reserve, National Guard of the State of Maine.

 House Report No. 1231, Committee on Naval Affairs, 60th Congress (1st Session).

 House Report No. 1794, p. 1, House Committee on Naval Affairs, 61st Congress, 3d Session, December 20,1910.